[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff Rosemary Petrucci, whose maiden name was Godo, and the defendant Donald A. Petrucci, intermarried on March 12, 1964 in Norwalk, Connecticut.
There is one minor child, born to the plaintiff, Donald A. Petrucci, Jr., date of birth, May 8, 1975.
One other child born to the plaintiff and issue of this marriage, Orice, is an adult and emancipated.
No other children have been born to the plaintiff wife and none have been adopted.
Neither plaintiff or defendant is or have ever been on city or state welfare.
The plaintiff has resided in the state of Connecticut for the one-year time frame immediately preceding the filing of this complaint.
The marriage of these parties, the court finds, has broken down irretrievably and there is no hope for reconciliation.
This contested trial began on February 22, 1991, and after hearings on divers days concluded on March 15, 1991.
The parties filed briefs and claims for relief up to and through April 19, 1991.
The court takes jurisdiction of this matter and finds as follows.
This is the plaintiff's second marriage, the first having ended in divorce after four years. This is the defendant's first marriage and came at a time approximately twenty-seven years ago when the defendant was starting his own construction business. Previous to this he had worked in construction.
The defendant business grew into a multi-million dollar operation.
The plaintiff testified the defendant was a good provider cared for his family and enabled her and their children to enjoy a lavish lifestyle.
He gave her many gifts, including an existing 1985 Cadillac automobile, and the custody and use of a Maserali sports car of recent vintage. CT Page 5194
He provided her with credit cards, including American Express and Visa, whose charges he regularly paid.
He bought a large and beautiful home in Fairfield, Connecticut in 1978, renovated it for over a year, including in it many of the plaintiff's expressed desires and let her decorate it.
Ultimately, defendant put this house, valued variously between one and one-half million dollars, to over two and one-half million dollars, into plaintiff's name as sole owner in April 1989. Then the present apparent world-wide depression inflicted itself on everyone, including the defendant, who due to the fact that his business of construction, etc., is vitally involved with real estate, was particularly hard hit. Business opportunities, jobs, contracts and money all disappeared. From an alleged net worth of $46,000,000.00, the defendant now has a net worth of minus $11,000,000.00, that is being added to at the rate of $4,000,000.00 each year. All business assets are attached.
Eight creditor banks control him and his business and allow him to have an annual salary of $104,000. per year from the dwindling income realized from his business. This will soon end, it was predicted in testimony at trial. The defendant moved out of the Fairfield home in September 1989, and now lives in a rented apartment in Norwalk.
The defendant contends their marriage began to break down approximately fourteen years after their marriage, on or about 1978 or 1979.
The plaintiff testified in a deposition in June 1990 before the trial that the marriage breakdown occurred on or about December of 1987. However at trial she testified the breakdown occurred on March 13, 1989.
The defendant contends the wife caused the marriage to break down by withholding sex from him and her obsessive spending, and acquisitiveness for material possessions.
The plaintiff wife contends his being away so often on business, the close mouth he maintained on all business matters, and his alleged outside affairs with other woman caused the marriage to break down.
He showed with figures how she spent money and still does and she admitted she has withheld sex from him whenever she suspected he was involved with other women.
The plaintiff testified she saw lipstick hair at times on CT Page 5195 his clothing, condoms in his pocket (not for her), alleged hotel and credit card bills that did not include her presence and finally her `women's intuition' told her he was being involved with other ladies.
The defendant testified he did not have relations with any woman other than his wife prior to December of 1987. Thus giving the court reason to speculate the plaintiff's testimony giving March 1989 as the breakdown date may not be the truth. The reasoning given by plaintiff for her changing the alleged breakdown dates is that she did not comprehend the meaning of the word irretrievable as used in the June 1990 deposition and also that she was confused.
The plaintiff's sole witness, testified that plaintiff had `told her about 100 times' that the defendant was having affairs with another or other women. This hearsay testimony, in no particular time frame, was understandably not even objected to by the defendant.
"The exact time at which a marriage has broken down irretrievably is rarely absolutely clear." Everson v. Everson,4 Conn. App. 611 (1985).
The plaintiff's contention at trial, of March 1989 as the breakdown time is obviously based on the alleged American Express receipt for a hotel room that she alleges was used by the defendant and another woman on or about that date and stated the room charge was for double occupancy. The receipt in question was put in evidence by the defendant and did not reflect double occupancy. Also, the plaintiff did not have it in her possession as would be expected. She admits she found it while searching through defendant's possessions, "as she often did", but did not keep it. Her reasoning is questionable, and alone by itself this alleged incident cannot elevate this March 1989 date and make it the marriage breakdown date. This date is suspect because prior to this alleged incident, plaintiff had no evidence input of defendant's infidelity other than her `women's intuition', her findings allegedly of hair, lipstick, condoms, etc. and the general "100 times" hearsay testimony of her friend to bolster and frame her demand for alimony. This court finds the marriage of the parties had broken down prior to the defendant's alleged misconduct, and the alleged incidents that occurred after 1987 cannot be used in helping determine the alimony issue.
During the more than eighteen months prior to this hearing the defendant has been paying plaintiff's credit card bills that have averaged $1956.60 per month, the bills of her household and personal expenses of nearly $14,000. per month, while she paid an average of $1717.55 per month. He also gave her $375.00 per week CT Page 5196 "pocket money ."
He did all of this without being taken to court and ordered to do so by plaintiff.
There is no argument made by the plaintiff that she contributed to the success of the defendant's career. He kept her out of his business. She maintained the home, bore two children, and entertained whenever he asked her to. He provided for and supported the family well and does so now even while in dire financial straits.
The court finds the marriage has broken down irretrievably with no possibility of reconciliation. Whereupon it is adjudged that the marriage of the parties in this action be and is hereby dissolved, and they are each declared to be single and unmarried.
The court properly considered and weighed the applicability of all relevant statutory factors prior to deciding this case.
As to custody, the parties have stipulated that there shall be joint custody of the minor child with primary residence with the wife and reasonable and liberal visitation in the husband.
As to alimony, the plaintiff seeks a large periodic monthly payment for life, at her discretion with a "cost of living additur" yearly, consistent with the consumer price index for Fairfield County. This marriage, began in 1964, and the court having heard the parties allegations has not imputed fault to either as the cause of the breakdown.
They are both in their late fifties age wise, and in apparent good health. The wife has alleged several medically unsupported ailments, and lack of skills, as well as twenty-seven years at home, as her reasons why she cannot and has not worked. There is no legal evidence that she cannot.
The defendant has earned large incomes and shared it with his family. Now through no fault of his, he earns a small annual income that will soon stop, and there is no assurance that he will ever earn a large income again. There are no jobs for a man of his skills at his age, and his earning capacity based on what he has earned, is not be considered.
Additionally, the defendant may be paying off his creditor banks etc., till he dies. He has nothing of value.
The plaintiff owns her jewelry, furs and her house. If she sells it as the defendant has urged her to, she can realize enough from the sale to pay off the mortgages, her lawyers small balance CT Page 5197 and after investing the net that will be assuredly over one, and possibly one million dollars plus, receive interest and/or dividends of $80,000 to $100,000. per year. Further, if she works she can increase the above sums. With this kind of money and over one million dollars principal as collateral she can buy a smaller house sufficient to her needs and live well. The court does not order alimony to be paid to either party. The "cost of living additur" argument of the plaintiff is without authority in Connecticut law, as is the plaintiff's attempt to subvert Rubin v. Rubin, 204 Conn. 224 to hold that there can be a property division in plaintiff's favor contingent upon a future event, such as the defendant's financial recovery. The house in effect is her lump sum alimony.
As to Child Support. Defendant is ordered to pay $160.00 per week to the plaintiff for child support until the death of the husband, the wife, the child or the emancipation of the child whichever is the sooner. Such payments for the child are to be made to the wife only when the child is actually living with the plaintiff.
As to the House. The parties agree that this house at 3853 Congress Street in Fairfield, Connecticut shall remain the sole property of the plaintiff with any and all insurance and taxes, delinquent and current to be the responsibility for the plaintiff.
As to Life Insurance. There is no reason for an order for the defendant to place any insurance upon his life for the benefit of the plaintiff.
The court orders each party to pay their own counsel fees.
As to Health Insurance. The wife's request to remain on the husband's health insurance policy for a term of three years after entry of a decree of dissolution at the husbands expense is denied. They became legal strangers after the dissolution decree.
To grant this request would be the same as granting the plaintiff some alimony.
As to Personal Property. To be divided as per the agreement of the parties and if not so agreed to the matter may be returned to the court.
As to Private School Educational Expenses. As agreed to and if no so decided, then it may be returned to the court.
Motor Vehicles. The court orders the defendant to have the title of the Cadillac automobile transferred to the plaintiff, free and clear of any encumbrances. The plaintiff is ordered to CT Page 5198 return the Maserati automobile to the defendant. Upkeep, Insurance to be borne by each party for their car.
As to Income Tax Returns. Each of these divorced people are expected to abide by the laws of the land in re the payment of their respective income taxes in the future with no duty or obligation to share their returns with the other.
Partnership Interests. The partnership interests of the defendant are of no value to him at all. Everything he owned is liened by his creditor banks, in amounts exceeding the value of his interests. Thus there is nothing of the defendants in this context, to give to the plaintiff. This is merely another "see and look" doctrine argument of the plaintiffs that is totally without merit.
Judgment is ordered as herein stated.
WILLIAM B. RAMSEY, STATE TRIAL REFEREE